IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOHN ALEXANDER    :
   Plaintiff    :
          :
          :
 vs.        : No. 3:22-cv-1195
          :
          : Judge Mariani
B. MYERS,      :
Corrections Lieutenant;  :
E. SPECK,      :
Corrections Lieutenant;  :
D. WISER,      :
Corrections Lieutenant;  :
S. ELLENBERGER,    :
Hearing Examiner;    :
K. KIFER,      :
Inmate Accounts Supervisor; :
J. TAYLOR, and     :
C. GREENLEAF,     :
Corrections Officers   :
State Correctional Institution :
at Smithfield,     :
1120 Pike Street    :
Huntingdon, Pennsylvania,  :
   Defendants    : (Jury Trial Demanded)

FILED
SCRANTON

DEC 01 2022

PER _____
DEPUTY CLERK

AMENDED COMPLAINT

The Plaintiff, John Alexander, pro se, hereby initiates this 42 U.S.C. § 1983

civil rights action against the defendant prison officials, and seeks declaratory,

injunctive and compensatory relief for violations of his constitutional rights.

I. Jurisdiction

1. This Court has jurisdiction, pursuant to 28 U.S.C. § 1331, § 1343(a) and

§ 1367, to adjudicate the Plaintiff's constitutional and pendent state law claims.

This Court also has jurisdiction over this matter pursuant to 42 U.S.C. § 1983, by

virtue of the presence of federal constitutional and civil rights questions as set forth herein below.

II. Parties

2.   The Plaintiff, John Alexander, is a citizen of the United States, and is presently incarcerated as a state prisoner committed to Pennsylvania Department of Corrections (DOC) care, custody and control.  Plaintiff is currently housed at the State Correctional Institution (SCI) at Somerset, Pennsylvania.  At times material hereto, Plaintiff was also housed at SCI-Smithfield, in Huntingdon, Pennsylvania.

3.   Defendants B. Myers and E. Speck are corrections lieutenants employed by the DOC, and at all times material hereto, were assigned to SCI-Smithfield, where they were posted within the facility security office.  As such, Defendants Myers and Speck were supervisory officers who were responsible for day-to-dey management of security office operations, with authority to direct activities of subordinate corrections officers.

4.   Defendant D. Wiser is a corrections lieutenant employed by the DOC, and at all times material hereto, was assigned to SCI-Smithfield, where he was posted within the facility Restricted Housing Unit (RHU).  As such, Defendant Wiser was a supervisory officer, responsible for day-to-day operation and management of the RHU, and was authorized to direct activities of subordinate corrections officers.

5.   Defendant S. Ellenberger is a Hearing Examiner employed by the DOC, and on the date material hereto, was assigned to SCI-Smithfield, where he functioned as a misconduct hearing examiner.  As such, Defendant Ellenberger was responsible for conducting hearings to adjudicate prisoner misconduct charges and to mete out appropriate disciplinary sanctions.  In executing his responsibilities, Defendant

Ellenberger must comport with the procedural due process guarantees applicable to administrative hearings, providing for notice of charges, meaningful opportunity to defend and an impartial decisionmaker.

6.   Defendant K. Kifer is an Accounts Specialist employed by the DOC, and at all times material hereto, was assigned to SCI-Smithfield, where she functioned as the Inmate Accounts Supervisor.  As such, Defendant Kifer was responsible for the overall operation and management of the SCI-Smithfield inmate accounts office, and attendant duties.  Defendant Kifer's responsibilities included supervision of all prisoners' accounts, and verification of account balances for purposes of prisoner in forma pauperis applications to the courts.

7.   Defendants J. Taylor and C. Greenleaf are corrections officers employed by the DOC, and at all times material hereto, were assigned to SCI-Smithfield, and were posted within the facility security office.  As such, Defendants Taylor and Greenleaf were subordinate to Defendants Myers, Speck and Wiser, acting at their direction within their spheres of responsibility.

8.   All defendants acted under color of state law at all times material to this matter.  Defendants are sued in their individual and official capacities.
III. Material Factual Allegations.

9.   Plaintiff has been in DOC care, custody and control since 2007, serving a life imprisonment sentence.

10.  On June 20, 2019, the Plaintiff was transferred to SCI-Smithfield, along with all his authorized personal property.

11.  As part of the transfer process, all of Plaintiff's personal property, including electronics, was checked, searched and cleared on June 19, 2019 by the

sending facility, and again, on June 21, 2019, by the receiving facility.

12. On about June 21, 2019, the Plaintiff was questioned by Defendant Myers about his previous behavior and adjustment record. Defendant Myers additionally noted that Plaintiff had an extensive grievance and litigation history, and stated that such activities would not be tolerated at SCI-Smithfield. Plaintiff was then assigned to a general population housing unit.

Sabotage of Legal Mail

13. In early June 2017, while the Plaintiff was housed in the RHU at SCI-Camp Hill, a corrections officer assaulted him without justification. Specifically, CO1 Huber assaulted the Plaintiff by smashing a metal wicket (hand aperture) onto his hand-cuffed hands, causing injury. This incident was recorded by a video camera located in the RHU yard area, and the recording was preserved.

14. Plaintiff thereafter prepared a civil action complaint, naming CO1 Huber as a defendant, asserting constitutional and other claims, including imposition of cruel punishment and retaliation.

15. Plaintiff mailed his civil action complaint, along with a hand-drafted in forma pauperis application, to the United States District Court, where it was received and filed on May 28, 2019. On June 4, 2019, the case was transferred to the middle district, where it was docketed at no. 3:19-cv-0947.

16. By order dated June 5, 2019, the United States District Court informed the Plaintiff that he needed to pay a filing fee, or submit a properly-supported application for leave to proceed in forma pauperis, in connection with his civil action no. 3:19-cv-0947. Such "properly supported" application entails accounts documents provided, and verified, by an Inmate Accounts Office official.

17.   Pursuant to SCI-Smithfield policy, any prisoners requiring verification of account information (in connection with an application for leave to proceed in forma pauperis in court) must submit an open, unsealed addressed envelope, the in forma pauperis form, and cash slips authorizing postage deduction.  The envelope, in forma pauperis form and cash slips are normally sent to Inmate Accounts Office, but at SCI-Smithfield, such packets must be submitted to a corrections officer for official verification of the cash slip.  Local policy does not permit a prisoner to obtain verification of cash slips, and then deposit the packet into the secured mail box on the unit.

18.   On June 25, 2019, the Plaintiff submitted a packet of documents to unit corrections officers for official verification of DOC cash slips.  Said packet of documents included an addressed envelope, a completed in forma pauperis form for civil action no. 3:19-cv-0947, cash slips to pay postage, and a Request to Staff asking the Inmate Accounts Office to complete and mail the form to the court, all stapled together.  The unit corrections officer accepted the packet of documents and informed the Plaintiff that they would be processed.

19.   In a written response dated July 10, 2019, Defendant Kifer informed the Plaintiff that the addressed envelope was missing from the packet of documents he submitted on June 26, 2019 for processing.

20.   The packet of documents submitted by the Plaintiff on June 26, 2019 was secured together with a staple.  The absence of the addressed envelope indicated that it was deliberately removed from the packet.  Plaintiff therefore prepared a second, identical set of documents, with the intention of submitting those to the unit supervising corrections officer.

21.   On July 11, 2019 the Plaintiff submitted a second packet of documents to Sergeant Larson for verification of the DOC cash slips.  (The second packet was a new set of originals, identical to those described at ¶ 18 above.)  The Plaintiff attempted to obtain the needed verification, and then deposit the packet into the secured prison mail box.  Sergeant Larson accepted the documents, but refused to return them to the Plaintiff for mailing.  Sergeant Larson informed the Plaintiff that they would be retained in his possession for processing.

22.   The second packet of documents (submitted on July 11, 2019) was, in part or in whole, taken, delivered or sent to the SCI-Smithfield security office.

23.   On July 15, 2019 the Plaintiff submitted another envelope, along with a cash slip, to the Inmate Accounts Office in an attempt to get the first in forma pauperis form (submitted on June 26, 2019) mailed to the court.  The Plaintiff did so because, based on "lost" items and comments made by unit corrections officers, it appeared that his submitted documents were being sabotaged.

24.   In a written response dated July 29, 2019, Defendant Kifer informed the Plaintiff that none of his documents could be located in that office.  Plaintiff followed up with his unit manager, who, on August 7, 2019, stated that neither the Inmate Accounts Office, nor the Mail Room, could locate the documents.

25.   The documents submitted by the Plaintiff on June 26, 2019, and on July 11, 2019, were taken, delivered or sent to the SCI-Smithfield security office.  At that juncture (i.e., July through September 2019) some or all of the Plaintiff's documents were retained in the SCI-Smithfield security office, and said documents were retained there at the direction of, or through approval by, Defendants Myers, Speck and Greenleaf, and/or with consent of Defendant Kifer.

26. On or about September 2, 2019 the Plaintiff received an August 15, 2019 order by the U.S. District Court, dismissing civil action no. 3:19-cv-0947 for his failure to file the in forma pauperis documents.

27. On about September 17, 2019 the Plaintiff filed a grievance (no. 824107) to claim unlawful interference with his in forma pauperis documents, resulting in dismissal of his civil action no. 3:19-cv-0947.

28. On October 2, 2019 the Plaintiff once again attempted to submit a third packet of documents for official verification of the DOC cash slips. (The packet of documents contained a new set of originals, identical to those described herein above.) Again, corrections officers accepted the packet and assured the Plaintiff that it would be processed.

29. In a written response dated October 3, 2019, Defendant Kifer informed the Plaintiff that a packet of his documents had been received by Inmate Accounts Office, that the in forma pauperis form had been completed, and that it would be mailed out the next day.

30. Despite the October 3, 2019 written assurances by Defendant Kifer that the third packet of documents (submitted on October 2, 2019) had been received at the Inmate Accounts Office, and would be mailed the next day, said documents were, in fact, NOT mailed to the court. In its March 17, 2022 order, the United States District Court reaffirmed that the Plaintiff's in forma pauperis application had not been received in connection with civil action no. 3:19-cv-0947.

31. After a complete packet of in forma pauperis documents has been received at the Inmate Accounts Office and duly prepared for mailing, only accounts office personnel, or the security office, would be able to interfere with or prevent such

packet from being delivered to the mail room for posting.

32. The third packet of documents (submitted October 2, 2019) was not posted due to intervening actions by Defendant Kifer, and/or Defendants Myers or Speck, or corrections officers acting at their direction.

33. Outgoing mail (postal mail & requests to staff) that prisoners place in the unit mail box, or submit to unit corrections officers, is examined, screened and reviewed by the SCI-Smithfield security office. Such examination, screening and review of unit mail is supervised by Defendants Myers and Speck, and done by Defendants Greenleaf, Taylor and other corrections officers.

34. Defendants Myers and Speck may authorize or require increased scrutiny of mail deposited or submitted by any particular prisoner, for purposes of general observation, or specific investigation.

35. Defendants Myers and Speck authorized or required that the Plaintiff's mail be subjected to increased scrutiny. As a result, all outgoing mail deposited or submitted by the Plaintiff in 2019 and 2020 was first removed or taken to the security office for examination, screening and review. Accordingly, the packets of documents submitted by the Plaintiff on June 26, 2019 and on July 11, 2019 were first delivered or taken to the security office.

36. The increased scrutiny of Plaintiff's mail, as authorized or required by Defendants Myers and Speck, extended beyond outgoing mail placed in the unit mail box, or submitted to unit corrections officers, and also included outgoing mail in possession of accounts office and/or mail room personnel.

37. On December 10, 2020, the Plaintiff was in the RHU, awaiting a transfer to another facility. On that date, Defendant Greenleaf approached the Plaintiff's

cell, and began to loudly harangue and mock him for filing grievances and lawsuits against prison officials.  During this encounter, Defendant Greenleaf acknowledged that he, along with others in the security office, were the ones responsible for interfering with the in forma pauperis documents that Plaintiff tried to send out to the court in 2019.

38.  The encounter described in the preceding paragraph was so loud that it was easily overheard by other prisoners in nearby cells.

39.  On January 12, 2021, the Plaintiff's transfer was imminent, and that was generally known by corrections officers.  On that date, Defendant Greenleaf once again approached the Plaintiff and said "now that you're finally leaving us, you can finally file a lawsuit without us interfering."  Defendant Greenleaf made his comments in a loud, mocking voice which was easily overheard by other prisoners in the adjacent cells.

40.  The encounters involving Defendant Greenleaf (described in the preceding paragraphs) are merely representative of more, similar encounters.  Beginning in February 2020, Defendant Greenleaf repeatedly approached the Plaintiff's cell to harangue him about filing grievances and civil actions, to gloat about Plaintiff's RHU placement, or to brag about disrupting Plaintiff's litigation efforts.

41.  Plaintiff engaged in constitutionally protected activity when he filed civil action no. 3:19-cv-0947, and when he repeatedly submitted in forma pauperis forms to corrections officers for processing.  Additionally, the Plaintiff engaged in similarly protected activity when he filed official grievances, both before and after his transfer to SCI-Smithfield.

42. The Defendants' actions (as described in the preceding paragraphs) were intended to penalize the Plaintiff for his grievance and litigation activities.

43. The Defendants' actions (as described in the preceding paragraphs) were intended to disrupt, sabotage or prevent the Plaintiff's ability to litigate his claims against DOC officials in civil action no 3:19-cv-0947.

44. As a consequence of the Defendants' actions (described in the preceding paragraphs), the Plaintiff

(a) was unable to file a properly-supported (by documents provided, and verified, by an Inmate Accounts Office official) application for leave to proceed in forma pauperis;

(b) was deprived of all opportunity to prosecute his meritorious claims when the court dismissed his case for failure to file a properly supported in forma pauperis application;

(c) was precluded from proceeding with assistance by attorney Phillip Paul, who had expressed interest in the case (see 06/10/19 letter, copy attached hereto as Exhibit A.); and

(d) was therefore denied access to the court in the matter of his civil action, docketed at no. 3:19-cv-0947.

45. After the Plaintiff's transferr out of SCI-Smithfield, he filed a motion to reopen the case at no. 3:19-cv-0947. The court, on March 17, 2022, denied said motion based on Plaintiff's failure to file a properly supported in forma pauperis application. See, 03/17/22 Order, copy attached hereto as Exhibit B.

46. As a result of Defendants' actions, as described herein above, Plaintiff was denied access to the court for the purpose of prosecuting non-frivolous claims.

## Retaliation

47.  Plaintiff is entitled to submit an official grievance about any issues, concerns or problems that cannot otherwise be resolved. See, DC-ADM 804 (Inmate Grievance System). The DOC grievance system is the only administrative process by which Plaintiff may compel prison officials to respond.

48.  Many DOC officials and employees dislike the grievance process because it (1) requires a written response (2) within a specified time, (3) which becomes a matter of record. See, DC-ADM 804. In addition, many officials and employees perceive the grievance system as an adversarial process, utilized by prisoners to state claims "against" them, or to criticize, contest or challenge their actions. Accordingly, prisoners, like Plaintiff, who freely utilize the grievance process are commonly viewed with disfavor, rancor, hostility and/or resentment.

49.  The SCI-Smithfield security office (and Defendants posted therein) was, by June 21, 2019, aware of the Plaintiff's grievance and litigation history. Soon thereafter, the Plaintiff's grievance and litigation history was generally known amongst all SCI-Smithfield officials and employees.

50.  In the months after the Plaintiff's transfer to SCI-Smithfield, he filed a number of grievances about various issues, concerns and problems that could not be resolved in any other way. (Additionally, the Plaintiff continued his attempts to litigate previously-filed civil actions wherein DOC officials and employees are named defendants.) A number of the Plaintiff's grievances concerned actions taken by the SCI-Smithfield security office, which were directed by Defendants Myers and Speck. See, e.g., Grievances nos. 813589 and 815140 (security office confiscation of personal property: television).

51.  On or about August 16, 2019, Defendant Speck interviewed the Plaintiff in connection with grievances about the confiscation of his television  Defendant Speck first declaimed his grievances generally, and then noted that he was at SCI-Smithfield for only two months, but already filed several grievances.  Defendant Speck concluded by warning the Plaintiff that his continued pursuit of grievance and lawsuits would result in negative consequences.

52.  On or about September 20, 2019, another SCI-Smithfield prisoner, Leonard Chaplain, approached the Plaintiff to discuss his grievances.  (The Plaintiff and Chaplain are cousins, and were previously acquainted.)  At that time, Chaplain was employed by the security office as a highly-ranked confidential informant, and as such, he was made aware of the grievance-based acrimony between the Plaintiff and corrections officers.  Chaplain warned the Plaintiff that the security office was sabotaging his in forma pauperis applications, and planned to further penalize him for filing grievances.  In concluding, Chaplain begged the Plaintiff to cease his grievances, and offered to mediate between Plaintiff and the security office.

53.  On January 20, 2020, a SCI-Smithfield corrections officer was assaulted by a prisoner.  That prisoner was brought to the RHU, where corrections officers beat said prisoner and eventually placed him in a cell.  After that, the officers acted extremely angry and hostile towards RHU prisoners, and became increasingly agitated and antagonistic when all RHU prisoners (including the Plaintiff) started demanding medical treatment for the beaten prisoner.

54.  On February 2, 2020, February 10, 2020 and again on February 11, 2020, the Plaintiff was repeatedly exposed to oleoresin capsicum (OC) when corrections officers sprayed liberal amounts of OC on other prisoners in nearby RHU cells.  No

precautions were taken to protect the other prisoners (including Plaintiff) from OC spill-over.

55.  Some of the RHU prisoners (including Plaintiff) suffered injury from OC exposure during the February 2, 10 and 11, 2020 use-of-force (OC) incidents.  As these incidents were occurring, most RHU prisoners (including the Plaintiff) were complaining and expressing concerns about what was being done, and additionally, were demanding ventilation and medical treatment.

56.  The February 10, & 11, 2020 use-of-force incidents (in the RHU) involved multiple corrections officers, who were already irate, hostile and agitated about the preceding prisoner assault upon an officer, and the subsequent demands, by all RHU prisoners, for medical treatment.  The officers sprayed liberal amounts of OC, several times, on five different RHU prisoners, who were secured (locked) in their cells.  The spraying of OC on February 10 & 11, 2020, was excessive and punitive.

57.  Defendants Wiser, Myers and/or Speck directed or authorized the February 2, 10 and 11, 2020 uses of force (OC) against RHU prisoners.

58.  Plaintiff thereafter filed grievances (nos. 848561 and 851096) to claim that the February 2, 10, and 11, 2020 use-of-force (OC) incidents violated law and policy and health and safety protocols.

59.  On or about February 23, 2020, Defendant Wiser interviewed Plaintiff in connection with grievances nos. 848561 and 851096, and commenced the interview by stating that the grievances were totally frivolous and a waste of time.  Defendant Wiser was extremely hostile, and berated the Plaintiff for filing the grievances, and then asked Plaintiff to "sign off" on (withdraw) grievance no. 851096.  When the Plaintiff declined to do so, Defendant Wiser assured Plaintiff that it would

go better for him (Plaintiff) if he did not persist in pursuing the grievance.

60.   Plaintiff's grievance and litigation activities, his refusal to withdraw or compromise his claims, and his persistence in speaking out about prison issues and prisoner concerns, engendered an acrimonious, hostile attitude from Defendants Myers, Speck, Wiser, Greenleaf and Taylor.   These Defendants resented and despised the Plaintiff because of his grievance and litigation activities.

61.   Plaintiff engaged in constitutionally protected activity when he filed his grievances, when he litigated his claims in court, and when he spoke out about prison issues and prisoner concerns.

62.   The Defendants' actions and/or inactions (as described in the preceding paragraphs), were intended to penalize, and retaliate against, all RHU prisoners (including Plaintiff) for the prisoner assault upon an officer, and their verbal complaints and demands for ventilation and medical treatment, insofar as excessive force (OC) was used, without adequate protective precautions.

63.   The Defendants' actions and/or inactions (as described in the preceding paragraphs), were intended to penalize, and retaliate for, Plaintiff's grievances, litigations and other protected activities.

64.   As a consequence of the Defendants' actions or inactions (as described in the preceding paragraphs), the Plaintiff was threatened, publicly labeled as a chronic, frivolous complainer, subjected to unwarranted searches and seizures of his property, placed in the RHU and repeatedly exposed to OC during excessive use-of-force incidents.   Additionally, the Defendants began to formulate and implement their plans to create justifications to transfer Plaintiff to the Drug Elimination Management Operation (DEMO) unit.

## Misconduct Allegations

65.  On April 30, 2020 a corrections officer delivered incoming mail to the Plaintiff, which mail was mixed and stapled together with incoming mail addressed to another prisoner (Roberts) housed in a nearby cell.

66.  Plaintiff subsequently filed grievance no. 869112 about the mail mix-up, and Defendant Wiser was assigned to address said grievance.  Defendant Wiser then conferred with Defendant Myers about how to respond to Plaintiff's grievance, and together they falsely stated that "at no time was your mail stapled together with inmate Roberts mail" and thereupon denied the grievance.

67.  Upon further (appeal) review of grievance no. 869112, the superintendent determined that the Plaintiff's mail was, in fact, stapled together with prisoner Robert's mail.  Thus, it was eventually confirmed that Defendants Wiser and Myers denied the Plaintiff's grievance based on a falsehood.

68.  On the morning (0900hrs) on June 24, 2020, Defendant Myers prepared and issued misconduct report no. D450762 to charge the Plaintiff with possession of a controlled substance, possession of contraband, conspiracy and unauthorized use of the mail and telephone.  The charges were based on Defendant Myers' interpretation of Plaintiff's correspondence and conversations, and on alleged contraband found at a residence belonging to Plaintiff's sister.  Additionally, these charges were based upon allegations that Plaintiff conspired with Siani Alexander (Plaintiff's daughter) and others to smuggle synthetic marijuana in through the mail.  However, the misconduct report stated no time frames whatsoever, and provided no reference to receipts for any of the evidence.

69.  On the evening (1920hrs) of June 24, 2020, the Plaintiff was taken from his cell and Defendants Greenleaf and Taylor conducted an investigative search of all items in the cell.  At some point during the search, Defendant Wiser entered the cell, and then closed and covered the cell door.

70.  Beginning at about 1920hrs on June 24, 2020, Defendants Wiser, Greenleaf and Taylor searched through the Plaintiff's personal property, including his legal materials and documents, for about two hours.  During the course of this search, these Defendants removed every staple, and left the Plaintiff's personal property in complete disarray: papers mixed and strewn everywhere, bedding trampled on the cell floor, commissary food items opened and dumped out and toothbrush floating in the toilet.  Defendants acted with clear malice in handling Plaintiff's personal property items during the search.

71.  When the search was completed, the Plaintiff addressed his concerns with Defendants Wiser and Greenleaf, who stated that this is what complaining gets you. Defendant Greenleaf additionally promised further repercussions if the Plaintiff continued his grievance and litigation activities.

72.  As a result of the June 24, 2020 search, Defendants Wiser, Greenleaf and Taylor seized the Plaintiff's legal documents, research notes, witness affidavits, photos, institutional papers and address and phone books.  Additionally, Defendant Greenleaf seized several old letters, which were dated and written in 2015.

73.  On June 24, 2020, Defendant Greenleaf issued Confiscated items Receipt no. 8924054 for certain items seized during the June 24, 2020 search.  The receipt listed some seized items, but completely omitted any reference to the old (2015) letters seized from Plaintiff's cell.

74.  On June 29, 2020, the Plaintiff filed a grievance (no. 875381) claiming violation of DOC procedures in how the search was conducted, and unlawful seizure or destruction of personal property items.  This grievance additionally noted that the Confiscated items Receipt did not list most of the seized items.

75.  On or about July 1, 2020, Defendant Greenleaf spoke with the Plaintiff about his grievance (no. 875381) and requests for the return of the items seized from his cell during the June 24, 2020 search.  At that time, Defendant Greenleaf stated that all seized items would be retained by the security office.  Defendant Greenleaf also stated that Defendant Myers intended to use the old (2015) letters as "evidence" to support the re-written misconduct charges.

76.  Defendant Myers supervised the preparation of Confiscated Items Receipt no. 6924054 on June 24, 2020 and in particular, he directed Defendant Greenleaf to omit any reference to the old letters seized during the June 24, 2020 cell search.  This omission enabled Defendant Myers to conceal the origin of the letters, the age or dates of the letters, and when or where the letters were seized --so they could be presented as "valid" evidence in support of misconduct charges.

77.  On July 2, 2020, the Plaintiff attended a misconduct hearing before the Hearing Examiner (Szelewski) normally assigned to SCI-Smithfield.  Szelewski read the letters and listened to recorded conversations and, disagreeing with Defendant Myers' interpretation, dismissed all misconduct charges.

78.  Defendant Myers acted irritated and angry by the July 2, 2020 dismissal of the misconduct charges, but he assured the Plaintiff that the charges would be re-written and that he "had something" for him.

-- 17 --

79.  On July 2, 2020, Defendant Myers prepared and issued misconduct report no. D450789, once again charging possession of a controlled substance, possession of contraband, conspiracy and unauthorized use of the mail and telephone.  These charges were based on Defendant Myers' interpretation of Plaintiff's written and verbal communications, and on alleged contraband found at a residence belonging to the Plaintiff's sister.  These charges were additionally based on allegations that Plaintiff conspired with Siani Alexander (Plaintiff's daughter) and other persons to smuggle synthetic marijuana through the mail.

80.  Misconduct report no. D450789 differed from the initial (June 24, 2020) misconduct report in that it alledged new, different facts to support the charges. Unlike the initial misconduct report, the re-written charges were based on letters written and sent by other prisoners --since the Plaintiff's own letters could not support the charges.  The re-written charges were also based on old (2015) un-sent letters, which are seized during the June 24, 2020 cell search, even before the initial misconduct report was prepared.

81.  The July 2, 2020 misconduct report (no. D450789) prepared by Defendant Myers stated no time frames whatsoever, and provided no reference to receipts for any of the evidence.  Moreover, said misconduct report included the name of a non-existent prisoner, Rhamon Roberts, as an involved conspirator.

82.  On July 7, 2020, the Plaintiff attended his second misconduct hearing in this matter, before a substitute Hearing Examiner (Defendant Ellenberger) who was specially assigned to SCI-Smithfield for that date.

83.  Defendant Ellenberger was brought in to SCI-Smithfield on July 7, 2020, and on July 16, 2020, for the sole purpose of adjudicating misconduct no. D450789.

Defendants Ellenberger, Myers and Speck are well acquainted with each other, based on Defendant Ellenberger's previous working relationship with the SCI-Smithfield security office, which orchestrated his presence on July 7, 2020.

94.   Defendant Ellenberger commenced the July 7, 2020 misconduct hearing by advising the Plaintiff that he (Ellenberger) was assigned to conduct the hearing as a "Favor For a Friend" and that he would credit Defendant Myers' allegations over Plaintiff's denial.  Defendant Ellenberger further stated that the Plaintiff would not be permitted to present his evidence or call his witnesses, and then he urged Plaintiff to plead guilty to one charge in exchange for dropping the others.

85.   Plaintiff refused to plead guilty to the misconduct no. D450789 charges, and informed Defendant Ellenberger that he wanted to present evidence and call his witnesses.  At that point, Defendant Ellenberger became irate and launched into a lengthy, personally insulting diatribe which included racial slurs.  The Plaintiff waited, and then asked Defendant Ellenberger to view the evidence against him, and again insisted that he wanted to call his witnesses.  Defendant Ellenberger became even more enraged, and he then postponed and continued the hearing.

86.   The hearing to adjudicate the charges at misconduct no D450789 resumed on July 16, 2020 with Defendant Ellenberger presiding and Defendant Myers present.  Both Defendants Ellenberger and Myers demanded that Plaintiff plead guilty to at least one of the charges.  When the Plaintiff declined, Defendant Myers explained that Ellenberger was his friend, and he would never believe the word of a prisoner over his (Myers) allegations.  The Plaintiff again stated that he was not guilty, that the evidence cannot support the charges, and he requested his witnesses.

87.  After the Plaintiff refused, for the second time, to plead guilty at the continued (July 16, 2020) misconduct hearing, Defendant Ellenberger stated that he did not need to view the evidence, that he believed Defendant Myers' allegations, and that he would not consider any defense witnesses.  Then Defendant Ellenberger summarily found Plaintiff guilty on all charges.

88.  Had the Plaintiff been allowed to call witnesses and present evidence at his July 7, 2020 misconduct hearing, he could have (1) established, by laboratory testing, that absolutely no synthetic marijuana was on the papers seized from his sister's residence, (2) that, pursuant to RHU mail procedures, it was not possible for Plaintiff to send mail out under another prisoner's name, (3) that the letters relied on by Defendant Myers were old, dating from 2015, about five years before, and had been seized from his cell on June 24, 2020, and (4) that contrary to the false denials by Defendant Myers, the Plaintiff's mail was previously mixed with, and stapled to, another prisoner's mail, which was verified by the superintendent, and (5) all (written & verbal) communications referenced in the misconduct report were incriminating only in accordance with Defendant Myers' interpretation, which was not accepted by the previous Hearing Examiner.

89.  After the conclusion of the July 7, 2020 misconduct hearing, at 1000hrs, another prisoner, Edward Friedland, was brought before Defendant Ellenberger for a hearing on misconduct charges against him.  Defendant Ellenberger stated to that prisoner (Friedland) that "I care less whether you win or lose; I'm only here to make sure that the asshole that just left (Plaintiff) gets punished."  Ellenberger also said that he would order a dismissal (without prejudice) so that the regular SCI-Smithfield Hearing Examiner (Szelewski) would adjudicate the charges.  Indeed,

-- 20 --

the misconduct charges (against Friedland) were never re-written.

90.  On July 7, 2020, after prisoner Edward Friedland left the hearing room,
the next prisoner, Tamir Hammer, was escorted in before Defendant Ellenberger for
a hearing on the charges against him.  At that time, Defendant Ellenberger stated
to Hammer that he was not assigned to punish him, but rather, he was assigned to
SCI-Smithfield on that date to make sure that Alexander gets punished.  Defendant
Ellenberger then ordered a continuance so that the regular SCI-Smithfield hearing
Examiner (Szelewski) could adjudicate the misconduct charges against Hammer.

91.  On July 17, 2020, the Plaintiff appealed from the findings and sanctions
in connection with misconduct no. D450789, which appeal was rejected on July 24,
2020.  Subsequent appeals to the superintendent and to the DOC central office were
also denied.

92.  After the first hearing before Defendant Ellenberger, on July 7, 2020,
the Plaintiff filed grievance no. 877085, claiming denial of due process and also
violation of his civil rights.  Plaintiff asserted that Defendant Ellenberger was
strategically assigned to SCI-Smithfield on July 7, 2020 for improper purposes, to
penalize the Plaintiff irrespective of actual guilt or innocence.  Defendant Wiser
addressed grievance no. 877085, and denied all claims, which decision was upheld
through subsequent appeals.

93.  On July 20, 2020, the Plaintiff submitted a Request to Staff, addressed
to Defendant Myers, to ask about the security office restriction of his daughter's
telephone number.  In a July 22, 2020 written response, Defendant Myers implicitly
acknowledged that Plaintiff's daughter (Siani Alexander) was not involved in the
alleged drug-related misconduct.

94.  On about July 24, 2020, Defendants Myers, Speck and/or Wiser directed, authorized or approved restrictions of telephone communications between Plaintiff and Siani Alexander, his daughter, and John Alexander, his son.  These Defendants blocked telephone numbers 267-328-0945 and 267-579-8622, to prevent the Plaintiff from speaking with either his son or his daughter.  There is no valid evidence to justify these restrictions.

95.  On July 27, 2020, the Plaintiff filed a grievance (no. 880553) to claim that Defendants Myers, Speck and/or Wiser abused their authority in preventing all telephone communications with his son and daughter.  The grievance was denied.

96.  Plaintiff was found guilty of, and penalized for, the various charges at misconduct no. D450789 based on machinations by Defendants Myers, Speck and Wiser, who (1) manufactured and/or "interpreted" evidence to implicate the Plaintiff, and after an impartial Hearing Examiner (Szelewski) heard and rejected their evidence, these Defendants (2) engineered the strategic assignment of Defendant Ellenberger to conduct a sham hearing to reach a predetermined guilty finding.

97.  Defendants Myers, Speck and/or Wiser knew that laboratory testing of the papers seized from the Denise Alexander residence would produce a negative result, i.e., that said papers did NOT contain synthetic marijuana.

98.  Defendants Myers, Speck and/or Wiser knew that the letters seized during their June 24, 2020 search of the Plaintiff's cell were old (dated from 2015) and never mailed to anyone, and thus had no actual relevance to any events, in 2020, at SCI-Smithfield.

99.  Defendants Myers, Speck and/or Wiser knew that, pursuant to RHU policy, corrections officers check each outgoing letter to verify that it bears the name

and number of the prisoner who mailed it --making it impossible for the Plaintiff to mail letters using other prisoner's name and number.

100. Defendants Myers, Speck and/or Wiser knew that, despite their contrary assertions, the Plaintiff's incoming mail was mixed and stapled with incoming mail of another prisoner.

101. Defendants Myers, Speck and/or Wiser knew that their "interpretation" of the Plaintiff's verbal and written communications represented subjective opinions that were not accepted by an impartial Hearing Examiner.

102. Defendants Myers, Speck and/or Wiser knew that Defendant Ellenberger is predisposed in their favor, and would conduct a misconduct hearing in accordance with their instructions or suggestions.  These defendants requested, or arranged for, Defendant Ellenberger to be present at SCI-Smithfield on July 7, 2020 and on July 16, 2020, to adjudicate the charges at misconduct no. D450789 because of his bias, predisposition and willingness to act at their direction, i.e., to sustain the charges without examining the evidence or hearing witnesses.

103. In fact, no valid, competent evidence supported Defendant Ellenberger's finding that the Plaintiff was guilty of the charges as alleged by Defendant Myers at misconduct no. D450789.

104.  Plaintiff engaged in constitutionally protected activity in filing his grievances at SCI-Smithfield, in defending against the charges at the hearing for misconduct report no. D450762, and in pleading not guilty to, and in attempting to defend against, the charges at the hearing for misconduct report no. D450789.

105.  The Defendants' actions (as described in the preceding paragraphs) were intended to penalize the Plaintiff's grievance activities, his refusals to plead

guilty to the misconduct charges, and his attempts to defend against the charges at his misconduct hearings.

106. As a consequence of the Defendants' actions (described in the preceding paragraphs), the Plaintiff was found guilty of, and sanctioned for, manufactured misconduct charges based on unfounded, unsupportable allegations in a sham hearing conducted by a biased decisionmaker. Additionally, the Plaintiff was, since 2020, prevented from speaking (via telephone) with his son and daughter. Finally, his daughter was unfairly defamed by wholly malicious, unfounded allegations.

Program Transfer

108. Sometime in 2020, Defendant Myers and Speck prepared a transfer packet requesting or recommending that Plaintiff be placed in the DEMO program.

109. Defendants Myers and Speck relied on misconduct no. D450789 to support their request or recommendation that the Plaintiff be transferred to a DEMO unit. These Defendants additionally provided an analysis of Plaintiff's behavior, which entailed exaggerated conclusions indicating that he is a high-level participant in facility drug trafficking activities.

110. Defendants Myers and Speck submitted the request or recommendation (for Plaintiff's DEMO placement) to the DOC central office, with the expectation that Plaintiff would be placed in the DEMO unit.

111. Prisoners placed in the DEMO program are confined in segregated housing, with limited privileges, for at least one year.

112. The Defendants' actions (as described in the preceding paragraphs) were intended to penalize, and retaliate for, Plaintiff's grievances, litigations and other protected activities. Defendants' actions were also intended to remove the

-- 24 --

Plaintiff from their facility for the same reasons.

113.   As a consequence of the Defendants' actions (described in the preceding paragraphs), Plaintiff was eventually placed in a DEMO unit.

IV. Exhaustion of Remedies

114.   Plaintiff grieved, or attempted to grieve, all claims stated herein, to the best of his ability, as described in the preceding paragraphs.  Additionally, the Plaintiff appealed, or attempted to appeal, all denials of his grievances.

115.   At some points, official interference and other official actions made it impossible for Plaintiff to actually or timely grieve an issue, or appeal from the denial of a grievance or grievance appeal.  Such incidents rendered the grievance system unavailable.

116.   Plaintiff appealed, through all levels, from the findings and sanctions by the Hearing Examiner as misconduct no. D450789.

V. Equitable Tolling Factual Allegations

117.   As a consequence of Defendants' actions (as described in the preceding paragraphs), the Plaintiff was confined in the RHU from January 30, 2020 to about January 15, 2021.  Because of said RHU confinement, and also due to COVID lockdown restrictions, Plaintiff had no access to paralegal assistance during this period.

118.   On about January 15, 2021, the Plaintiff was transferred to SCI-Fayette, along with his personal property.  Upon his arrival at SCI-Fayette, Plaintiff was immediately placed in the RHU, and remained confined in the RHU for approximately two months.  During this period, the Plaintiff was not permitted to have access to any of his personal property, including legal materials.  Additionally, because of said RHU confinement, and also due to COVID lockdown restrictions, Plaintiff had no

access to paralegal assistance during this period.

119.  On about March 11, 2021, the Plaintiff was transferred to SCI-Houtzdale, without his personal property.  Plaintiff's personal property remained in storage at SCI-Fayette, and was shipped separately at a later date.

120.  On about April 14, 2021, officials at SCI-Fayette shipped some, but not all, of Plaintiff's personal property to SCI-Houtzdale.  Plaintiff's property was processed and delivered to the Plaintiff on about April 28, 2021, at which time he discovered that his keyboard and his legal materials (three boxes) were missing.

121.  The missing three boxes of legal materials (as described in the preceding paragraph) contained Plaintiff's documents related to civil action no 3:19-cv-0947 and copies of institutional documents (request slips, grievance files, misconduct reports, property receipts) from his time at SCI-Smithfield.

122.  Sometime in early August 2021, officials at SCI-Fayette shipped more of the Plaintiff's personal property to him at SCI-Houtzdale, which was processed on August 11, 2021.  At that time, the SCI-Houtzdale property sergeant noted that the boxes of Plaintiff's legal materials were still missing.  See, 08/11/21 Property Receipt, copy attached hereto as Exhibit C.

123.  On about May 12, 2022, the Plaintiff was transferred to SCI-Somerset, but still without his missing three boxes of legal materials.

124.  After his transfer to SCI-Somerset, the Plaintiff made arrangements for his family to forward a copy of his civil action no 3:19-cv-0947 documents, and his SCI-Smithfield institutional documents, to an attorney for mailing.

125.  Plaintiff prepared and filed this action as soon as practicable after he received the pertinent documents, and obtained access to paralegal assistance.

VI. Causes of Action

### COUNT I

Alexander v. Myers, Speck, Greenleaf and Kifer
(Pursuant to 42 U.S.C. § 1983)

126.  The Plaintiff, by this reference, incorporates paragraphs 1 through 125 above as though they were fully set forth herein at length.

127.  Defendants' interference with, or sabotage of, the Plaintiff's documents in his civil action no 3:19-cv-0947 violated rights guaranteed by the United States Constitution, including but not limited to:

(a)  the First Amendment right to be free of punishment and retaliation for protected activities such as speech, petitioning for redress of grievances and accessing the courts;

(b)  the First and Fourteenth Amendment right to access the courts for purposes of presenting, prosecuting and litigating non-frivolous claims; and

(c)  the Fourteenth Amendment right to due process of law in presenting, prosecuting and litigating claims in court.

128.  As a result of said violations, Plaintiff suffered injuries and harms, including those described in the preceding paragraphs.

### COUNT II

Alexander v. Myers, Speck, Wiser, Greenleaf and Taylor
(Pursuant to 42 U.S.C. § 1983)

129.  The Plaintiff, by this reference, incorporates paragraphs 1 through 128 above as though they were fully set forth herein at length.

130.  Defendants' actions and/or inactions, resulting in the Plaintiff being threatened, publicly labeled as a complainer, subjected to unjustified searches or

seizures, and placed in the RHU and exposed to OC, violated rights guaranteed by the United States Constitution, including but not limited to:

(a)  the First Amendment right to be free of punishment and retaliation for protected activities such as speech, petitioning for redress of grievances and accessing the courts;

(b)  the Eighth Amendment right not to be subjected to cruel and unusual or excessive punishments; and

(c)  the Eighth Amendment right to be protected from events, conditions and/or official uses of force that may endanger health, safety and well-being.

131.  As a result of said violations, Plaintiff suffered injuries and harms, including those described in the preceding paragraphs.

COUNT III

Alexander v. Myers, Speck, Wiser, Ellenberger, Greenleaf and Taylor
(Pursuant to 42 U.S.C. § 1983)

132.  The Plaintiff, by this reference, incorporates paragraphs 1 through 131 above as though they were fully set forth herein at length.

133.  Defendants' search of the Plaintiff's cell, and related seizure of his personal property, and ensuing manipulation of the misconduct and hearing process, and restriction of family communications, violated rights guaranteed by the United States Constitution, including but not limited to:

(a)  the First Amendment right to be free of punishment and retaliation for protected activities such as speech, petitioning for redress of grievances and accessing the courts;

(b)  the First Amendment right to freedom of association, including the

-- 28 --

right to intimate familial relations and communications;

(c)  the Eighth Amendment right not to be subjected to cruel and unusual or excessive punishments;

(d)  the Fourteenth Amendment right to due process of law, including the substantive rights to fundamental fairness, and to an impartial decisionmaker, in adjudicating charges and imposing punishments; and

(e)  the Fourteenth Amendment right to due process of law, including the right to possess and enjoy personal property interests free of unwarranted official seizure, destruction or interference.

134.  As a result of said violations, Plaintiff suffered injuries and harms, including those described in the preceding paragraphs.

COUNT IV

Alexander v. Myers, Speck, Wiser, Ellenberger, Greenleaf and Taylor
(Pursuant to 28 U.S.C. § 1367 -- supplemental jurisdiction)

135.  The Plaintiff, by this reference, incorporates paragraphs 1 through 134 above as though they were fully set forth herein at length.

136.  Defendants' manipulation of the misconduct hearing process, emplacement of a biased hearing examiner, refusal to evaluate evidence or permit any defense witnesses, and allegations defaming Plaintiff and Siani Alexander, violated rights established pursuant to PA statutes, regulations and common law, and administrative agency policies, including but not limited to:

(a)  Pennsylvania statutes at 42 Pa.C.S. §§ 8341, et seq., together with Pennsylvania common law, providing rights and remedies related to defamatory and malicious comments; and

(b)   Pennsylvania regulations at 37 Pa.Code § 93.10, implemented through

DOC agency policy at DC-ADM 801, establishing procedural rights, including a right

to an impartial decisionmaker and a right to present evidence or witnesses.

137.   As a result of said violations, Plaintiff suffered injuries and harms,

including those described in the preceding paragraphs.

COUNT V

Alexander v. Myers and Speck
(Pursuant to 42 U.S.C. § 1983)

138.   The Plaintiff, by this reference, incorporates paragraphs 1 through 137

above as though they were fully set forth herein at length.

139.   Defendants' actions in requesting or recommending that the Plaintiff be

transferred for eventual placement in the DEMO program, violated rights guaranteed

by the United States Constitution, including but not limited to:

(a)   the First Amendment right to be free of punishment and retaliation

for protected activities such as speech, petitioning for redress of grievances and

accessing the courts; and

(b)   the Fourteenth Amendment right to due process of law, including the

procedural and/or substantive rights to fundamental fairness, and to an impartial

decisionmaker, in adjudicating charges and imposing punishments.

140.   As a result of said violations, Plaintiff suffered injuries and harms,

including those described in the preceding paragraphs.

VII. Jury Demand

141.   Plaintiff demands a jury determination of all facts and issues that may

be so tried.

VIII. Prayer for Relief

WHEREFORE, the Plaintiff prays that this Honorable Court grant or order the following relief:

(a)   declare that the Defendants, individually, jointly and/or severally, violated the constitution and laws as claimed herein above;

(b)   enjoin the Defendants to provide a new hearing, with all requisite due process protections, to adjudicate the charges at misconduct no. D450789;

(c)   enjoin the Defendants to cease and desist the continuing effects of the punitive, retaliatory actions taken against the Plaintiff in 2019 and 2020;

(d)   enter a judgment in favor of Plaintiff and against all Defendants, individually, jointly and/or severally;

(e)   award compensatory damages to the Plaintiff, against all Defendants, individually, jointly and/or severally;

(f)   award exemplary, or punitive damages to the Plaintiff, against all Defendants, individually, jointly and/or severally;

(g)   award fees and litigation costs to the Plaintiff; and

(h)   enter an order for such other relief that this Court may deem just and appropriate.

Respectfully submitted,

John Alexander,
Plaintiff, pro se

DOC No. HB-6099
SCI-Somerset
1590 Walters Mill Road
Somerset, PA  15510

# LAW OFFICES
# JEFFREY PHILIP PAUL

Jeffrey Philip Paul
jeffpaul@dejazzd.com

Tobyn C. Dickinson
Paralegal

June 10, 2019

John Alexander No. HB6099
SCI Benner Township
301 Institution Drive
Bellafonte, PA 16823

RE:   Your Civil Rights Claim

Dear Mr. Alexander:

Thank you for your letter of May 21, 2019.

I would be happy to review everything which you have, in order to determine whether I would be willing to assume the representation of you. Therefore, if you would like to forward to me the affidavits, video footage and other documentary evidence which is in your possession, I will carefully review everything.

In the meantime, if you have any questions please feel free contact me.

Very truly yours,

Jeffrey Philip Paul

JPP/tcd

---

Please reply to:
☒ **LANCASTER**
124 E. Chestnut Street
Lancaster, PA 17602
Telephone: (717) 735-7545

☐ **POTTSVILLE**
91 S. Progress Avenue
Pottsville, PA 17901
Telephone: (570) 622-7330

Scheduling: (717) 735-7545
Toll free: (800) 336-3031
Facsimile: (717) 735-7548
www.jeffreypaullaw.com


EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

JOHN ALEXANDER,

      Plaintiff

    v.

CUMBERLAND COUNTY, et al.,

      Defendants

Civil No. 3:19-cv-0947

(Judge Mariani)

**ORDER**

    Upon consideration of Plaintiff's motion to reopen the above captioned action, which was closed on August 15, 2019 for Plaintiff's failure to comply with this Court's July 10, 2019 Amended Thirty Day Administrative Order[1] to either pay the required filing fee or submit a properly completed motion for leave to proceed *in forma pauperis*, and it appears that the time to comply has more than elapsed, **IT IS HEREBY ORDERED THAT** Plaintiff's motion to reopen (Doc. 14) is **DENIED.**

Dated: March 17, 2022

Robert D. Mariani
United States District Judge

---

[1]    On June 5, 2019, this Court issued a Thirty (30) Day Administrative Order which inadvertently included an incorrect application to proceed *in forma pauperis*. (Doc. 10). Although Plaintiff returned the incorrect application on July 8, 2019, aside from signing the form, Plaintiff provided no other information on the form. (Doc. 9). Thus, prompting that issuance of the Court's July 10, 2019 Amendment Thirty (30) Day Administrative Order, containing the proper form and instructions to Plaintiff to fully complete the form. (Doc. 10).

1

EXHIBIT B

*DB - 25*

Inmate Property Received

From: _____

_____ ∘ HOU _____

**STATE CORRECTIONAL INSTITUTION AT HOUTZDALE**

INMATE PERSONAL PROPERTY RECEIPT

SCI-HOUTZDALE MAIL ROOM

HTZ 124

Addressed To:

Name: *ALEXANDER*

No.: *HB 6099*

Description and Quantity of Articles Received:

*VAMAHA   463   KEYBOARD   (Keyboard only still missing 3 Box*

*S/N  ZO11I1*

I understand the above listed approved articles become part of my personal property and I may not lend, give, sell, trade or exchange them with other inmates at this Institution.

Inmate Signature _____      Number *HB 6099*

Attesting Officer Making Delivery *Cott.* _____ *Not Test*      Date *8/11/2021*

The following disapproved articles are to be returned to the sender and a DC-138A cash slip will be sent to the Mail Room to cover the necessary postage:

_____

_____

Inmate Signature _____      Number _____

Attesting Officer _____      Date _____

*EXHIBIT C*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOHN ALEXANDER                :
     Plaintiff            :
                             :
   vs.                 :     No. 3:22-cv-1195
                             :
                             :     Judge Mariani
B. MYERS, et al.,        :
     Defendants         :     (Jury Trial Demanded)

## CERTIFICATE OF SERVICE

I, John Alexander, pro se Plaintiff in the above-captioned matter, do hereby

certify that I am, on this _10_ day of November, 2022, serving a true and correct

copy of the foregoing document upon Defendants by mail, via U.S. First Class Mail,

addressed to:

                     Mary K. Yarish
                     Deputy Attorney General
                     Office of Attorney General
                     15th Floor, Strawberry Square
                     Harrisburg, PA  17120

                     _John Alexander_
                     John Alexander
                     Plaintiff, pro se

                     DOC No. HB-6099
                     SCI-Somerset
                     1590 Walters Mill Road
                     Somerset, PA  15510

Smart Communications/PADOC

SG#:

Name: John Alexander HB6099

Number: SCI Somerset

PO Box 33028: 1590 Walters Mill Road

St Petersburg FL 33733: Somerset, PA 15510-0001

PA Dept of Corrections
INMATE MAIL

US POSTAGE PITNEY BOWES

ZIP 15510  $ 002.40
02 1H
0001397502 NOV. 29  2022

Office Of The Clerk

United States District Court
Middle District of Penn
235 North Washington Ave
P.O. Box 1148
Scranton, PA 18501-1148